## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| CIRCLE K STORES INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO.: 2:07 CV 474-1D |
| | ) | |
| MICHAEL W. KING and JAMES M. KING, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### PLAINTIFF'S MOTION FOR FINAL DEFAULT JUDGMENT AGAINST DEFENDANT JAMES M. KING

Plaintiff Circle K Stores Inc. ("Circle K"), pursuant to Rule 55(b)(2) of the Federal Rules of Civil Procedure, respectfully submits this Motion for Final Default Judgment against Defendant James M. King. On August 23, 2007, the Court filed an order staying this case as to Defendant Michael W. King, pursuant to 11 U. S.C. 362(a). Although both Defendants are at times referenced in this Motion, based on the Court's August 23, 2007 Order, Circle K is seeking entry of final default judgment only as to Defendant James M. King.

### I. RELIEF REQUESTED

Plaintiff moves the Court for Final Default Judgment against Defendant James M. King in the amount of $147,320 as compensatory damages and also reasonable attorneys' fees and costs.

### II. STATEMENT OF FACTS

Defendant James M. King was properly served with a copy of the Summons and the Plaintiff's Complaint. Defendant failed to timely appear or otherwise defend in this action. On

August 8, 2007, the Clerk of Court for the Middle District of Alabama made an entry of default against Defendant James M. King.

Defendant James M. King is not to the knowledge of the undersigned (a) an infant or incompetent person, or (b) in military service or otherwise exempted under the Soldiers' and Sailors' Civil Relief Act of 1940. See Exhibit A to Motion for Clerk's Default Against Michael W. King and James M. King.

Plaintiff's Complaint alleges the following uncontested facts. Spectrum Realty, Inc. ("Spectrum") and Defendants James and Michael King entered into a lease agreement on or about November 20, 2005 ("the Lease"). See Complaint, at ¶ 6; see also Exhibit 1 to Affidavit in Support of Plaintiff's Motion for Default Judgment Against Defendant Michael W. King and James M. King ("Affidavit in Support of Default"), attached hereto as Exhibit A.[1]

Circle K acquired all of Spectrum's rights under the Lease pursuant to an April 2006 Purchase and Assignment Agreement. See Purchase and Assignment Agreement, Exhibit 2 to Affidavit in Support of Default. In May 2006, Defendants acknowledged the assignment of the Lease to Circle K and the validity of the Lease in a Tenant Estoppel Certificate. See Tenant Estoppel Certificate, Exhibit 3 to Affidavit in Support of Default.

Pursuant to the Lease, Defendants opened and began operating a martial arts school at a piece of commercial property on the northwest corner of Burbank Drive and Atlanta Highway at 5771 Atlanta Highway, in Montgomery, Alabama. See Complaint at ¶ 7; see also Exhibit 3 to Affidavit in Support of Default. However, beginning in November of 2006, Defendants stopped

---

1.     Please note that this affidavit was prepared prior to the Court's August 23, 2007 Order. Although both Defendants are referenced in the affidavit, based on the Court's August 23, 2007 Order, Circle K is seeking entry of final default judgment only as to Defendant James M. King.

making their rental payments and abandoned the property and the Lease. See Complaint, at ¶ 7;

see also Affidavit in Support of Default. This conduct constitutes a breach under the

unambiguous terms of the Lease. See Exhibit 1 to Affidavit in Support of Default, at ¶ 18 (a)

(failing to pay the monthly rental payment constitutes a breach of the Lease).

Though Circle K had no obligation to do so, it provided Defendants with formal written

notice of its breach under the Lease. See Complaint, at  ¶ 8. Defendants did not respond. Id.

As a result, under the terms of the Lease, Circle K is allowed, and has elected to accelerate the

outstanding rents due under the Lease. See Exhibit 1 to Affidavit in Support of Default, at

¶18(3). Under the terms of the Lease, Circle K is also entitled to attorney fees. Id. at ¶ 19.

With this in mind, Circle K calculates its damages as follows: $147,000 for the remaining

rents due on the lease; and $320 for maintaining the landscaping on the subject property. Circle

K also requests the opportunity to submit evidence of attorneys' fees and expenses at the

conclusion of this matter.

## V. LEGAL AUTHORITY

This Motion is made pursuant to Fed. R. Civ. P. 55. As alleged in Plaintiff's Complaint,

the Defendants are liable for breach of contract. Under Alabama law, to prove a breach of

contract claim, the plaintiff must establish the existence of a valid contract between the plaintiff

and defendant, his own performance under the contract, defendant's non performance, and

damages. Wiggins v. Risk Enterprise Management, Ltd., 14 F. Supp. 2d 1279 (M.D. Ala. 1988).

In addition, under Alabama law, if the contract terms are unambiguous, then there is no room for

construction, and it is up to the court to enforce the contract as written. See Wheelan v. Sessions,

50 F. Supp. 2d 1169 (M.D. Ala. 1999)

As outlined herein, a valid lease agreement existed between Circle K and Defendants Michael W. King and James M. King. Beginning in November 2006, the Defendants stopped making their rent payments and abandoned the property and the Lease. See Complaint, at ¶ 7. This conduct constitutes a breach under the unambiguous terms of the Lease. See Exhibit 1 to Affidavit in Support of Default, at ¶ 18 (a).

Upon default, the well-pleaded allegations of a complaint are taken as true. See Buchanan v. Bowman, 820 F.2d 359, 361 (11th Cir. 1987) ("The liability of [the defendant] is not at issue. Such liability is well-pled in the complaint, and is therefore established by the entry of default against him."). As such, Defendants Michael W. King and James M. King's liability is already established. Id.

The only issue for the Court, then, is the amount of damages that should be awarded to Circle K. The terms of the Lease agreement are clear and unambiguous, upon breach of the Lease by the Defendants, Circle K is entitled to an acceleration of the outstanding rents due under the Lease. The Lease was due to terminate on November 30, 2010. The Defendants breached the Lease beginning with the November 2006 monthly rental payment. Therefore, Circle K is entitled to the remaining forty-nine (49) monthly rental payments due under the acceleration clause of the Lease. The monthly rental payment specified in the Lease was $3,000, which equates to a total accelerated rental payment of $147,000. In addition, as a result of the Defendants' breach of the Lease, Circle K has had to maintain the landscaping and grounds on the subject property at its own expense. Therefore, Circle K requests an additional $320 as consequential damages for maintaining the landscaping on the subject property.

Rule 55 of the Federal Rules of Civil Procedure only requires a hearing on a motion for final default judgment "if … necessary to determine the amount of damages." No such hearing

4

is necessary in this case. Plaintiff's Complaint sought an amount of damages authorized under the unambiguous terms of the Lease. The Lease specifically allows for an acceleration of outstanding rental payments as compensatory damages for a breach of the Lease agreement, as well as attorney's fees and expenses. Defendants were thereby placed on notice of the claimed damages. Because Defendants did not timely answer or otherwise defend that claim, the Court may enter the default judgment without the benefit of a hearing. See U.S. v. DeFrantz, 708 F.2d 310, 312 (7th Cir. 1982) (citing Davis v. Fendler, 650 F.2d 1154, 1162 (9th Cir. 1981)).

In summary, Circle K is entitled to a default judgment in the amount of $147,320, plus reasonable attorneys' fees and costs. Circle K requests leave to file a submission verifying its total attorneys' fees and costs at the conclusion of this matter. On August 23, 2007, the court filed an order staying this case as to Defendant Michael W. King pursuant to 11 U. S.C. 362(a). Although both Defendants are at times referenced in this Motion, based on the Court's August 23, 2007 Order, Circle K is seeking entry of final default judgment only as to Defendant James M. King.

**WHEREFORE**, Circle K respectfully requests that the Court enter a default judgment against Defendant James M. King in the amount of $147,320 plus attorneys' fees and expenses.


Respectfully submitted this 31st  day of August, 2007.


Respectfully Submitted,


/s/ JOHN D. MAYO
One of the Attorneys for Plaintiff
Circle K Stores Inc.

5

OF COUNSEL:
J. Banks Sewell (SEWEB4299)
David R. Pruet III (PRUED9725)
John D. Mayo (MAYOJ2469)
LIGHTFOOT, FRANKLIN & WHITE, L.L.C.
The Clark Building
400 North 20th Street
Birmingham, Alabama  35203-3200
(205) 581-0700
(205) 581-0799 (fax)

## CERTIFICATE OF SERVICE

I hereby certify that on this the 31st day of August, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Gregory M. Pool, Esq.
Attorney at Law
P.O. Box 2247
Montgomery, AL 36102-2247

I hereby certify that I have on this 31st day of August, 2007, served the foregoing upon counsel of record for all parties to this proceeding, by placing a copy thereof in the United States Mail, first-class postage thereon prepaid and properly addressed as follows:

James M. King
3120 Rolling Road
Montgomery, Alabama  36111-1718

/s/ JOHN D. MAYO
Of Counsel

### IN THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | | |
|---|---|---|
| CIRCLE K STORES INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO.: 2:07 CV 474-1D |
| | ) | |
| MICHAEL W. KING and JAMES M. KING, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### AFFIDAVIT IN SUPPORT OF PLAINTIFF'S MOTION FOR FINAL DEFAULT JUDGMENT AGAINST DEFENDANTS MICHAEL W. KING AND JAMES M. KING

**STATE OF ALABAMA** )

) 

**COUNTY OF JEFFERSON** )

Matthew Hermansen, being duly sworn, deposes and says:

1.      My name is Matthew Hermansen.  I am over the age of 21, of sound mind, suffer no legal disabilities, and am fully competent in all aspects to make this affidavit.  Based upon the positions I hold or have held, I have personal knowledge of the matters stated herein, and such matters are true and correct.

2.      I am the Assistant Secretary of Circle K Stores Inc. ("Circle K").  By virtue of my position,  I am familiar with Circle K's operations in Montgomery County, Alabama and particularly the piece of commercial property on the northwest corner of Burbank Drive and Atlanta Highway at 5771 Atlanta Highway, in Montgomery, Alabama which was leased by the Defendants Michael W. King and James M. King.

3.      Spectrum Realty, Inc. ("Spectrum") and Defendants James and Michael King entered into a lease agreement on or about November 20, 2005.  Attached hereto as Exhibit 1 is a



**DEFENDANT'S EXHIBIT**

A

true and correct copy of the Lease Agreement between Spectrum and Defendants James and Michael King.

4.      Circle K acquired all of Spectrum's rights under the Lease pursuant to an April 2006 Purchase and Assignment Agreement between Spectrum and Circle K. Attached hereto as Exhibit 2 is a true and correct copy of the Purchase and Assignment Agreement between Spectrum and Circle K.

5.      In May 2006, Defendants acknowledged the assignment of the lease to Circle K and the validity of the Lease in a Tenant Estoppel Certificate. Attached hereto as Exhibit 3 is a true and correct copy of the Tenant Estoppel Certificate.

6.      Beginning in November 2006, Defendants stopped making their rental payments and abandoned the property and the Lease. Accordingly, Circle K seeks accelerated rents calculated as follows. The Lease was due to terminate on November 30, 2010. Defendants breached the Lease beginning with the November 2006 monthly rental payment. There were forty-nine (49) monthly rental payments remaining under the Lease. The monthly rental payment specified in the Lease was $3,000. Thus, the total accelerated rent equals $147,000.

7.      In addition, as a result of the Defendants' breach of the lease, Circle K has been forced to maintain the landscaping and grounds of the subject property at is own expense. Circle K has expended $320 maintaining the landscaping on the subject property due to the Defendants breach of the lease.

**FURTHER AFFIANT SAITH NOT.**

By:   **MATTHEW L. HERMANSEN**

SWORN To and subscribed before me this _31_ day of _August_ , 2007, by _Matthew L. Hermans_ who is personally known to me.

_____

Notary Public

Official Seal
**Notary Public - North Carolina**
County of Mecklenburg
Rebecca L. Munoz
**My Commission Expires August 17, 2008**

(SEAL)

_____ Print Name

_____

My Commission Expires

Michael W. King & James M. King

**Spectrum No. 112**

## LEASE AGREEMENT

**THIS LEASE AGREEMENT** (hereinafter referred to as this "Lease"), made and entered into by and between **MICHAEL W. KING** and **JAMES M. KING**, individual residents of Montgomery County, Alabama, jointly and severally (hereinafter referred to jointly and severally as "Lessee"), and **SPECTRUM REALTY, INC.**, a Georgia corporation (hereinafter referred to as "Lessor"),

## W I T N E S S E T H   T H A T:

WHEREAS, Lessor is the owner of that certain tract or parcel of land located in Montgomery County, Alabama, on the north west corner of Burbank Drive and Atlanta Highway (US Hwy 80), that is shown on Exhibit "A" attached hereto and made a part hereof by this reference (the "Property"); and

WHEREAS, located on the Property is a building (the "Building"), a portion of which is used by Lessor and identified as "SPECTRUM SPACE, 1400 SQUARE FEET", on Exhibit "A", and the remaining portion of which that is identified on Exhibit "A" as "TENANT SPACE, 3500 SQUARE FEET", that Lessee desires to lease for the purpose of operating a martial arts school therein;

NOW, THEREFORE, in consideration of the mutual and reciprocal covenants and agreements set forth and contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Lessor and Lessee do hereby agree and contract as follows, to-wit:

1.    LEASED PREMISES. Lessor hereby leases to Lessee and Lessee hereby leases from Lessor, upon the terms and conditions set forth and contained herein, that portion of the Building that is identified on Exhibit "A" as "TENANT SPACE, 3500 SQUARE FEET" (the "Leased Premises").

2.    TERM OF LEASE. Lessee shall have and hold the Leased Premises for a term commencing on the Effective Date (as hereinafter defined) and ending on the last day of the sixtieth (60th) calendar month after the month of the Rent Commencement Date (as hereinafter defined), unless terminated earlier in accordance with the provisions of this Lease (hereinafter referred to as the "Initial Term") (for example, if the Rent Commencement Date were ~~August 10~~, 2005, the Initial Term would expire on August 31, 2010).

3    RENEWAL TERM. Lessee shall have the option to renew this Lease for one (1) additional term of five (5) years (herein referred to as the "Renewal Term"), upon the same terms and conditions as herein set forth. The Renewal Term hereunder shall commence at the



**DEFENDANT'S EXHIBIT**

379379

expiration of the Initial Term and shall expire on the fifth (5th) anniversary of the Renewal Term commencement date. The option granted hereunder to extend the term of this Lease shall be exercisable by Lessee by delivering written notice to Landlord of its election to exercise such option at least one hundred twenty (120) days prior to the expiration of the Initial Term.

4.    RENTAL.  The rents due hereunder shall not commence until the earlier of (i) the date Lessee opens for business on the Leased Premises, or (ii) the sixtieth (60th) day following the Effective Date of this Lease (the "Rent Commencement Date"). From and after the Rent Commencement Date, Lessee shall pay to Lessor, in advance, on the first day of each month, during the Initial Term $3000.00. During the Renewal Term, Lessee shall pay monthly rental payments of $3,500.

In the event the Rent Commencement Date does not occur on the first day of the calendar month, Lessee shall pay rent for said month equal to a pro rata amount of $3000.00, which shall be due and payable on the Rent Commencement Date.

If Lessor does not receive a monthly rental payment by the fifth (5th) day of the month in which it is due, Lessee shall incur a late charge equal to ten percent (10%) of said monthly rental payment, which shall be due and payable immediately, without demand.

5.    CONDITION OF LEASED PREMISES; MAINTENANCE AND REPAIR. Lessor is leasing the Leased Premises to Lessee in "AS IS, WHERE IS" condition. Lessee, at its sole cost and expense, shall be responsible for the regular maintenance and repair of the Leased Premises, including the HVAC system, except for such portions thereof as Lessor agrees to maintain and repair, and shall otherwise maintain and keep the Leased Premises in a clean and orderly condition. Lessor shall, at its sole cost and expense, maintain the structural walls and roof of the Leased Premises and shall be responsible for any needed replacement of any portion of the HVAC system, unless any such repairs, maintenance or replacement is due to the negligence of Lessee, its agents, servants, employees, contractors, customers or invitees, in which case Lessee shall be responsible for the costs thereof. In the event Lessee fails to perform any repairs or maintenance of the Leased Premises it is obligated to perform within ten (10) days after written notice from Lessor, Lessor may, but shall not be obligated to, perform such repairs or maintenance and Lessee shall reimburse Lessor for the costs for the same within ten (10) days after written notice from Lessor, as additional rental due hereunder. If such amounts are not paid when due, the same shall bear interest at the rate of fifteen per cent (15%) per annum from the date of Lessor's initial notice for payment until paid.

6.    INSURANCE; INDEMNIFICATION.  (a) Lessee shall assume all responsibility and liability for, and shall indemnify and save harmless Lessor from, any and all losses, damages, costs, expenses, claims or actions, including attorney's fees and costs of litigation, arising out of any personal injury, death, property damage and any other loss whatsoever caused by or arising from the condition, use or occupancy of the Leased Premises or in any way occasioned by or arising out of the activities of Lessee, Lessee's agents, servants, employees, contractors, visitors, invitees, subtenants, successors or assigns.

379379                                              -2-

(b)     Lessee shall procure and maintain throughout the Initial Term and the Renewal Term, at Lessee's sole cost and expense, a policy or policies of general comprehensive public liability insurance with a reputable insurance company licensed to do business in the State of Alabama and approved in advance by Lessor, insuring Lessee against all claims, demands, or actions arising out of the condition of the Leased Premises and Lessee's use, occupancy and possession thereof, and having single limit coverage in the amount of not less than One Million Dollars ($1,000,000) for personal injury, death or property damage in respect to any one accident or occurrence covered by the policy. Such policy or policies of insurance shall name Lessor and its affiliate, Spectrum Stores, Inc. ("SSI"), as additional insureds. Such insurance shall be subject to Lessor's approval. Lessee shall have such insurance in place and provide proof thereof in form satisfactory to Lessor, no later than the date Lessee takes possession of the Leased Premises and begins any activity thereon.

(c)     Lessee shall be responsible for all fire, casualty, loss, theft and extended coverage insurance underwritten by a reputable insurance company authorized to do business in the State of Alabama on all of Lessee's equipment, fixtures, personal property and leasehold improvements.

(d)     Lessee shall procure and maintain throughout the Initial Term and the Renewal Term, at Lessee's sole cost and expense, workmen's compensation insurance covering all employees and agents of Lessee with respect to whom death or bodily injury claims could be asserted against Lessor or Lessee, as required by the laws of Alabama.  All such policies evidencing such insurance shall name Lessor and SSI as additional insureds.

(e)     Lessee shall procure and maintain throughout the Initial Term and any Renewal Term, at Lessee's sole cost and expense, use and occupancy insurance in an amount satisfactory to Lessor covering rental income and/or business interruption, as applicable, and shall name Lessor as an additional insured with respect to its interest under this Lease.  Such insurance shall be subject to Lessor's approval, not to be unreasonably withheld.

(f)     Lessee shall be solely responsible for all of Lessee's leasehold improvements, equipment, fixtures and personal property and any damage or loss of the same howsoever caused and notwithstanding any other provisions of this Lease to the contrary.

(g)     Should Lessee fail to obtain and maintain in effect at all times during the Initial Term and the Renewal Term, any of the insurance coverages required under subparagraphs (b), (d) and (e) hereinabove, Lessor, at its option, may purchase and maintain such insurance and pay the premiums for the same, and Lessee agrees to and shall reimburse Lessor within ten (10) days after written notice from Lessor, for any and all costs and premiums of maintaining such insurance as additional rental due hereunder. If such amounts are not paid when due, the same shall bear interest at the rate of fifteen per cent (15%) per annum from the date of Lessor's initial notice for payment until paid.

(h)     Lessee shall furnish Lessor with copies of the insurance policies required under subparagraphs (b), (d) and (e) hereinabove, or certificates therefor prior to Lessee taking possession of the Leased Properties, and thereafter whenever requested by Lessor. Each such

379379                                              -3-

policy shall provide that it shall not be canceled or amended without at least thirty (30) days prior written notice to Lessor.

(c)    Lessor, for its sole benefit, may maintain fire and extended coverage insurance underwritten by a reputable insurance company authorized to do business in the State of Alabama on the Leased Premises.

7.    DUTY TO REPAIR OR REBUILD.    In the event the Leased Premises is destroyed or damaged by fire or other casualty such that the cost to repair such damage exceeds the sum of Twenty-Five Thousand Dollars ($25,000.00), Lessor shall have the option to declare this Lease ended and terminated, provided Lessor gives written notice of such election to Lessee within forty-five (45) days of the date of such fire or casualty.    If Lessor does not exercise its right to terminate this Lease, or if the cost of such damage is less than $25,000, then Lessee shall be obligated to promptly rebuild, repair or replace the Leased Premises, to the same or better condition as existed on the date of the event or occurrence causing such damage, but not including any of Lessee's leasehold improvements. Lessee shall complete such rebuilding, repairing or replacement within ninety (90) days from the date of said fire or casualty.

8.    TAXES AND ASSESSMENTS.    Lessor shall pay and discharge, as and when the same become due and prior to delinquency, all taxes, assessments, levies and other charges, general and special, which are or may be during the term of this Lease levied on or against the Property and Leased Premises. Lessee shall reimburse Lessor for forty-two percent (42%), of all such taxes, assessments, levies and charges, based on the square footage of the Leased Premises and the total square footage of the Building and the improvements identified as "NEW BUILDING (2500 SQ. FT.)" and "NEW CAR WASH, 1040 sq.ft." on Exhibit "A". Lessee's share of such taxes, assessments, levies and charges shall be paid by Lessee to Lessor within ten (10) days of written notice from Lessor, as additional rent due hereunder. If such amounts are not paid when due, the same shall bear interest at the rate of fifteen per cent (15%) per annum from the date of Lessor's initial notice for payment until paid.  Lessee shall pay and discharge, as and when the same become due and prior to delinquency, all taxes, assessments, levies and other charges, general and special, which are or may be during the term of this Lease levied on or against any fixtures, equipment, or other personal property owned by Lessee and located on the Leased Premises.

9.    UTILITIES; WASTE DISPOSAL.    Lessee shall at all times during the term of this Lease pay all charges for gas, water, electricity and any other utility services for the Building and the Leased Premises. In the event Lessee fails to pay any bills for any such utilities within ten (10) days after written notice from Lessor, Lessor may, but shall not be obligated to, pay the same and Lessee shall reimburse Lessor for such amounts within ten (10) days after written notice from Lessor, as additional rental due hereunder. If such amounts are not paid when due, the same shall bear interest at the rate of fifteen per cent (15%) per annum from the date of Lessor's initial notice for payment until paid.

Lessee shall have the option to provide its own dumpster/trash removal service if there is room for an additional dumpster on the Property as determined by Lessor, in its sole discretion, or it shall pay any increase in the cost of Lessor's current trash removal service related to

additional service needed to handle Lessee's trash and waste. The addition of a new dumpster shall be conditioned upon Lessee providing, at its sole cost and expense, any fencing or screening that Lessor may require, in its sole discretion. Lessee shall also maintain on a no less than monthly basis, regular extermination treatment and services on the Leased Premises for rodents, roaches, vermin and other pests.

10. <u>LESSEE'S PROPERTY</u>. Lessee may place and install in and on the Leased Premises such fixtures, and equipment necessary or reasonable for the conduct of Lessee's business therein (hereinafter referred to as "Lessee's Property") so long as Lessee is not in default hereunder. Lessee has the right to remove from the Leased Premises at any time and from time to time any of the Lessee's Property placed by Lessee on or in the Leased Premises; provided, however, any damage caused to the Leased Premises by the removal of any Lessee's Property shall be repaired in a first class manner by Lessee at its sole expense. Any Lessee's Property not removed by Lessee within ten (10) days after written notice from Lessor following the expiration or earlier termination of this Lease shall become the property of Lessor at the end of said ten (10) day period and Lessor shall be entitled to retain or dispose of the same in any manner seen fit by Lessor without any liability to Lessee.

11. <u>ENVIRONMENTAL MATTERS</u>. Lessee will not store, use or handle on the Leased Premises any hazardous substance or regulated substance.

12. <u>MORTGAGE BY LESSOR</u>. Lessee acknowledges, understands and agrees that this Lease shall be subject and subordinate to the lien of any mortgage or security deed which may now or hereafter affect the Property and the Leased Premises and to all renewals, modifications, consolidations, participations, replacements and extensions thereof, without the necessity of any further documentation. Upon request by Lessor, Lessee shall execute any such estoppel certificates or subordination agreements as required by any lender of Lessor that has a lien on the Property.

13. <u>EMINENT DOMAIN</u>. If so much of the Property or the Leased Premises is taken for any public or quasi-public use under any governmental law, ordinance, or regulation or by right of eminent domain or by private purchase in lieu thereof (each such action a "Taking"), so that Lessee's ability to conduct its business on the Leased Premises is substantially impaired, this Lease, at the option of Lessee, shall terminate and the rent shall abate during the unexpired portion of this Lease, effective with the physical taking of the Leased Premises. All awards for any such Taking shall be the sole property of Lessor.

14. <u>REDELIVERY OF PREMISES</u>. Lessee will, upon the expiration or earlier termination of this Lease, peaceably surrender and deliver to Lessor the Leased Premises in a clean condition and subject only to usual wear and tear. At Lessor's request, Lessee shall remove any leasehold improvements, equipment or fixtures placed upon the Leased Premises by Lessee If Lessee fails to remove any such items within ten (10) days of Lessor's request, the same shall become the property of Lessor, which Lessor may keep, remove or dispose of as it sees fit, and Lessee shall pay the costs incurred by Lessor in connection with any removal or disposal, immediately upon demand, as additional rent due hereunder. If such amounts are not

paid when due, the same shall bear interest at the rate of fifteen per cent (15%) per annum from the date of Lessor's initial request for payment.

15.    ASSIGNMENT OR SUBLETTING.  Lessee may not sublet all or any portion of the Leased Premises or assign or mortgage its interest under this Lease, without the prior written consent of Lessor, in Lessor's sole discretion.  Any sublease or assignment without such consent shall be void and of no effect and shall be a default hereunder.

16.    SIGNS.  Lessee may, at its sole expense and subject to the prior written approval by Lessor, in its sole discretion, install and maintain on the Leased Premises any signs and related facilities it deems necessary or proper.  At the termination of this Lease, Lessee may, and at Lessor's request shall, remove any signs, sign cabinets, poles and related facilities installed by Lessee; provided, however, that any damage caused to the Leased Premises or the Property by such removal shall be repaired by Lessee at its sole expense.

17.    IMPROVEMENTS TO LEASED PREMISES.  Lessee shall not make any improvements to the Leased Premises without Lessor's prior review and written approval of Lessee's plans and specifications, in Lessor's sole discretion. Lessee shall, at Lessee's sole cost and expense, construct and install dividing walls within the Building in order to separate the Leased Premises from the SPECTRUM SPACE. Any and all such improvements shall be made by a duly licensed and fully insured (comprehensive liability and worker's compensation) contractor. Lessor and Lessee acknowledge and agree that any and all such improvements shall be for the sole benefit, use and enjoyment of Lessee. Lessee shall have no authority to make any improvements to the Leased Premises for the benefit of Lessor unless previously requested and specified in writing by Lessor. Lessee shall have no authority of any kind to perform any work or improvements on the Leased Premises or the Property that would in any way create any contractor's, materialman's or any similar liens against Lessor's fee simple title to the Property and the Leased Premises.

18.    DEFAULT; REMEDIES.    In addition to any other events of default set forth elsewhere in this Lease, the occurrence of any of the following shall constitute an event of default under this Lease:

      (a)    Lessee fails to pay any monthly rental payment by the tenth (10th) day of the month in which it is due, or fails to pay any other amounts owed to Lessor hereunder as and when due; or

      (b)    Lessee fails to observe, keep or perform any of its other obligations under this Lease and such default continues for ten (10) days after written notice thereof from Lessor to Lessee, except in the case of an event of default provided for elsewhere in this Lease that does not provide for a cure period.

Upon the occurrence of an event of default, Lessor shall have the following remedies in addition to and not in limitation of, any other rights and remedies it may have hereunder, at law or in equity:

379379                                                        -6-

(1)    Lessor may terminate this Lease immediately and without notice to Lessee, in which event Lessee shall immediately surrender the Leased Premises to Lessor upon demand, and Lessee shall immediately pay to Lessor all unpaid rent for the period prior to termination. If Lessee fails to surrender the Leased Premises, Lessor may, without prejudice to any other remedy Lessor may have either at law, in equity, or under this Lease, enter upon the Leased Premises and expel or remove Lessee, Lessee's Property and any other personal property, with or without force and without being liable to Lessee in any manner whatsoever for trespass or damages therefor.

(2)    Lessor may, without terminating this Lease, enter the Leased Premises and remove Lessee, Lessee's Property and any other personal property, with or without force and without being liable to Lessee in any manner whatsoever for damages therefor, and may relet the Leased Premises as Lessee's agent and receive such rent therefor. In such event Lessee shall be liable to Lessor for any deficiency which may arise by reason of such reletting during the remainder of the then current term. Lessor may include, without limitation, brokerage commissions, cost of improvements, alterations and repairs, and attorneys' fees incurred in reletting the Leased Premises in computing Lessor's costs, losses, and damages for which Lessee is liable, and the proceeds of such reletting shall be first applied to such costs and expenses, then to the payment of rental payments and all other indebtedness of Lessee to Lessor hereunder, with the balance, if any, to be held by Lessor to be applied in payment of future rental payments and all other such indebtedness as the same becomes due and payable throughout the remainder of the then current term. Lessee shall not be entitled to any rental proceeds received by Lessor upon such a reletting that exceed any of the amounts due hereunder. Lessor shall not be liable to Lessee in any way for failure to relet the Leased Premises or to rent the Leased Premises for the same or greater rent.

(3) Lessor may, without terminating this Lease, accelerate all rents due hereunder for the remainder of the then current term, reduced to present value, which shall be due and payable on demand. Lessor and Lessee acknowledge and agree that (i) it would be difficult or impossible of accurate estimation to determine the damages to be suffered by Lessor upon a breach of this Lease by Lessee; (ii) the acceleration of rents as provided is intended to provide for damages and not a penalty; and (iii) the accelerated rents as reduced to present value is a reasonable estimate of Lessor's damages arising out of Lessee's defaults hereunder.

19.    ENFORCEMENT COSTS.  Lessee agrees to pay all costs and expenses incurred by Lessor, including reasonable attorney's fees actually incurred, in connection with its enforcement of the terms of this Lease and collection of any rents or other amounts owed by Lessee hereunder.

20.    PARKING.   Lessee shall not allow its employees, customers, contractors, agents or invitees to park their vehicles anywhere on the east side of the Property that is south of the NO PARKING LINE shown on Exhibit "A". Tenant shall be responsible for designating and marking, at its sole cost and expense, all parking spaces on the Property to the north of the NO PARKING LINE that are to be used by Tenant, its employees, customers, contractors, agents or invitees. The parking spaces shown on Exhibit "A" are not currently marked.

21.    <u>USE OF LEASED PREMISES</u>.  Lessee shall not use the Leased Premises for any purpose other than the operation of a martial arts school.

22.    <u>NO RECORDING</u>.  This Lease shall not be recorded.

23.    <u>LESSOR'S RIGHT TO ACT</u>.   In the event Lessee fails to perform any of its obligations hereunder, Lessor may, but shall not be required to, perform the same and Lessee shall reimburse Lessor, as additional rent due hereunder, Lessor's costs and expenses incurred in doing so, which amounts shall be paid within ten (10) days after written notice from Lessor. If such amounts are not paid when due, the same shall bear interest at the rate of fifteen per cent (15%) per annum from the date of Lessor's initial request for payment. Lessor's performance of any such objection on any one occasion shall not constitute an assumption by Lessor of any future performance of the same or any other obligations of the Lessee hereunder.

24.    <u>MISCELLANEOUS</u>.

(a)    Binding Agreement.  This Lease shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns.

(b)    Notices.  Any and all notices or communications required or permitted to be given under this Lease shall be considered as properly given or made, if delivered in person, or if mailed by certified or registered mail, return receipt requested, postage prepaid, or if delivered by courier that guarantees overnight delivery, and sent or addressed to the parties at their respective addresses as follows:

If to Lessee:    518 Bellhurst Drive, Montgomery, Alabama36109
(334) 260 - 9450

If to Lessor:    824 - Third Avenue, West Point, Georgia  31833
Attention:  Albert C. Woodroof, III, President
(706) 645-2275

(c)    Time of the Essence.  Time is of the essence of each and every term of this Lease.

(d)    Amendment.  This Lease may not be amended orally, by course of conduct or otherwise, but only by an amendment in writing properly executed by the parties hereto.

(e)    Entire Agreement.  This Lease constitutes the entire agreement between the parties hereto concerning the subject matter hereof.

(f)    Governing Law.  This Lease shall be construed and interpreted in accordance with the laws of the State of Alabama.

(g)    Effective Date.  The Effective Date of this Lease shall be the date signed by the last party to sign as indicated below their respective signature.

379379

**IN WITNESS WHEREOF,** Lessor and Lessee have executed this Lease, under seal, as of the Effective Date of this Lease.

VICTORY LOWE
NOTARY PUBLIC
STATE OF ALABAMA
COMM. EXP. 01-06-2009

_____
Witness

_____
Witness

_____
Witness

LESSEE:

_____ (L.S.)
Michael W. King
Date of Execution: ~~June~~ _____, 2005
NOV 20, 2005

_____ (L.S.)
James M. King
Date of Execution: ~~June~~ _____, 2005
NOV 20, 2005

LESSOR:

Spectrum Realty, Inc.

By: _____
Albert C. Woodroof, III
It's President
Date of Execution: ~~June~~ _____, 2005
November 20

(CORPORATE SEAL)

379379



ATLANTA  HIGHWAY (U.S. HWY 80)

## BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT

STATE OF GEORGIA,
COUNTY OF MUSCOGEE.

FOR AND IN CONSIDERATION OF Ten and No/100 Dollars ($10.00), and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and pursuant to that certain Asset Purchase and Sale Agreement, dated April 10, 2006 (hereinafter referred to as the "Purchase Agreement"), among Spectrum Stores, Inc., a Georgia corporation ("Spectrum Stores"), Spectrum Realty, Inc., a Georgia corporation ("Spectrum Realty"), and Spectrum Holding, Inc., a Georgia corporation (hereinafter referred to collectively as the "Seller"), and Circle K Stores Inc., a Texas corporation (hereinafter referred to as the "Purchaser"), the Seller has sold, bargained, assigned, transferred and conveyed and does by these presents sell, bargain, assign, transfer and convey, to the Purchaser and its successors and assigns the following described assets (hereinafter collectively referred to as the "Assets") used in Spectrum Stores' operations of the convenience stores at the locations identified on Schedule A attached hereto (each such store hereinafter referred to as a "Store", and together collectively referred to as the "Stores")(such operations hereinafter collectively referred to as the "Business"), to-wit:

TANGIBLE PERSONAL PROPERTY.  All fuel lines, fuel pumps and fuel and gasoline equipment, storage tanks, car wash equipment, machinery, operating equipment and supplies, office equipment and supplies, furniture, computer hardware and software of every kind and nature owned by Spectrum Stores on the Closing Date (as defined in the Purchase Agreement) located at the Stores and used in or relating to the Business, Including the items listed on Schedule B attached hereto (the "Tangible Personal Property"), together with all manuals, warranty rights and maintenance records relating thereto, if any, but excluding Inventory (as defined in the Purchase Agreement). In addition, the Tangible Personal Property shall include Seller's Resource Management Services/Professional Datasolutions, Inc. computer Server (the "Server"), and Purchaser agrees that Seller may continue to use the Server for up to one hundred twenty (120) days from the date hereof for the purpose of winding up the Business;

INVENTORY AND SUPPLIES.  All stock-in-trade, including motor vehicle fuels, supplies and merchantable merchandise inventory owned by Seller located at the Stores or in transit to the Stores on the date hereof;

PERMITS AND LICENSES. To the extent legally assignable, all of Sellers' right, title and interest in and to all permits, licenses, franchises, approvals and authorizations issued by any Governmental Authority (as defined in the Purchase Agreement), in the name of any Seller and used in the operation of the Business;

SELLER'S CONTRACTS.  All of Sellers' right, title and interest in and to all commitments, contracts for services and supplies, covenants not to compete, contracts, and all other agreements, whether oral or written, arising from or related to the Business to which Sellers are a party or by which Sellers are bound, but only to the extent they are permitted to and can be lawfully assigned and that are listed and identified on Schedule 2.4.1 of the Purchase Agreement;

DEFENDANT'S EXHIBIT

2

INTELLECTUAL PROPERTY; TRADE NAMES. The trade name "Spectrum" and associated trade marks and the trade name "Tobacco Crossing" and associated trade marks, subject to any limitations set forth in the Purchase Agreement and the goodwill of the Business associated therewith;

BOOKS AND RECORDS. All files and business records related to the continuing operation of the Business;

GOING CONCERN VALUE. The value of the Business as a going concern;

CASH. $1,500.00 of Seller's cash at each Store, unless there is a Seller owned ATM located at a Store, in which case the amount of cash for such Store shall be $3,000.00 (the "Cash");

FUNDS. Subject to the provisions of Section 4.8 of the Purchase Agreement, all rights, interests and claims of Seller under the Georgia Underground Storage Tank Trust Fund and the Alabama Underground and Aboveground Storage Tank Trust Fund (the "Funds"), relating to payment or reimbursement of costs, expenses or damages related to Releases (as defined in the Purchase Agreement), from USTs (as defined in the Purchase Agreement), or other Environmental Claims (as defined in the Purchase Agreement), at the Stores; and

OTHER ACQUIRED ASSETS. All other Acquired Assets (as defined in the Purchase Agreement), not described above other than the Owned Premises (as defined in the Purchase Agreement) or the Leased Premises (as defined in the Purchase Agreement), which are being conveyed to Purchaser by Spectrum Realty under separate deeds and assignments of leases.

EXCLUDED ITEMS. Notwithstanding the foregoing, the Assets do not include (a) any books of account, general financial and accounting, and other data owned or used by Seller on the Effective Date (as defined in the Purchase Agreement), (b) any cash or cash equivalents on hand (except for the Cash), and all cash equivalents on hand or on deposit, deposits, prepayments, accounts receivable, accrued and unpaid refunds (Including all refunds due from the Funds for remediation costs and expenses paid by Seller prior to the date hereof in connection with any past or current environmental corrective action plan for any Store), loans or certificates of deposits of Seller, (c) any vehicles owned or leased by Seller, (d) any minute books, stock books, stock transfer records and similar corporate records of Seller, (e) any rights under any pending or proposed litigation related to any class action claims, choate or inchoate, for any and all matters, events or occurrences first arising prior to the date hereof, (f) any beer or wine licenses, to the extent not legally transferable, and (g) all other Excluded Items (as defined in the Purchase Agreement).

Seller warrants that it has good title to the Assets free and clear of any and all charges, claims, liens or encumbrances of any nature whatsoever, except for any current year personal property taxes not yet due and payable. Seller will forever defend the right and title to the Assets unto Purchaser, and Purchaser's successors and assigns, against Seller, its successors and assigns and against the claims of any other persons.

The Assets are being conveyed to Purchaser "AS IS", "WITH ALL FAULTS", in the same condition as on the Effective Date, normal wear and tear excepted, without guaranties or warranties of any kind, express or implied except as to title.

Purchaser hereby assumes and agrees to pay, perform and discharge the Assumed Liabilities (as defined in the Purchase Agreement) in accordance with their terms.

THIS BILL OF SALE, ASSIGNMENT AND ASSUMPTION IS MADE TO FURTHER EVIDENCE THE SALE, ASSIGNMENT, TRANSFER AND CONVEYANCE OF ALL RIGHT, TITLE AND INTEREST IN THE ASSETS (as defined herein) AND THE ASSUMPTION OF THE ASSUMED LIABILITIES CONTEMPLATED BY THE PURCHASE AGREEMENT, AND NEITHER THIS BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT NOR ANYTHING CONTAINED HEREIN SHALL BE DEEMED TO AMEND, MODIFY, SUPPLEMENT, REDUCE OR EXPAND THE REPRESENTATIONS, WARRANTIES AND COVENANTS OF SELLER OR PURCHASER AND THE LIABILITY OF SELLER OR PURCHASER WITH RESPECT THERETO, SET FORTH IN THE PURCHASE AGREEMENT.

Seller hereby transfers and assigns to Purchaser any and all warranties with respect to the Assets to the extent the same are transferable.

IN WITNESS WHEREOF, Seller and Purchaser have caused this Bill of Sale to be executed by their duly authorized officer, under seal, as of the date first above written.

SELLER:

Spectrum Stores, Inc.

By:_____

    Albert C. Woodroof, III

    Its President

       (CORPORATE SEAL)

PURCHASER:

Circle K Stores Inc.

By:_____

    Robert G. Campau
    Vice President

                (CORPORATE SEAL)

- 4 -

## Schedule A
### Store Locations

1.  Spectrum No. 2 - 302 East 10th Street, West Point, GA 31833
2.  Spectrum No. 3 - 1304 Third Avenue, West Point, GA 31833
3.  Spectrum No. 5 - 426 South Greenwood, LaGrange, GA 30240
4.  Spectrum No. 7 - 215- 4th Street, Columbus, GA
5.  Spectrum No. 8 – 2536 Airport Thruway, Columbus, GA
6.  Spectrum No. 11 – 603 Hwy 29, Valley, AL
7.  Spectrum No. 12 – 2837 Phillips Rd., Lanett, AL
8.  Spectrum No. 14 – 1700 Auburn/Opelika Hwy, Auburn, AL
9.  Spectrum No. 15 – 2233 Ft. Benning Rd., Columbus, GA
10. Spectrum No. 16 – 1645 Manchester Expressway, Columbus, GA
11. Spectrum No. 19 – 2904- 20th Avenue, Valley, AL
12. Spectrum No. 20 – 57 N. Lafayette St., Lafayette, AL
13. Spectrum No. 21 – 3393 Highway 431, Roanoke, AL
14. Spectrum No. 22 – 1200 Columbus Pkwy, Opelika, AL
15. Spectrum No. 24 – 2905-20th Ave., Valley, AL
16. Spectrum No. 26 – 3720 Macon Rd., Columbus, GA
17. Spectrum No. 38 – 101 Gilmer Ave., Lanett, AL
18. Spectrum No. 39 – 1800 Stadium Rd., Phenix City, AL
19. Spectrum No. 40 – 588 Fob James Dr., Valley, AL
20. Spectrum No. 42 – 511 Second Ave., Opelika, AL
21. Spectrum No. 45 – 3010 Buena Vista Rd., Columbus, GA
22. Spectrum No. 46 - 4420 Second Ave., Columbus, GA
23. Spectrum No. 47 – 600 Shug Jordan Pkwy, Auburn, AL
24. Spectrum No. 48 – 1040 Floyd Rd., Columbus, GA
25. Spectrum No. 50 – 5448 Forrest Rd., Columbus, GA
26. Spectrum No. 51 – 5155 Warm Springs Rd., Columbus, GA
27. Spectrum No. 52 - 6900 Beaver Run Rd., Midland, GA
28. Spectrum No. 53 – 6101 Bradley Park Dr., Columbus, GA
29. Spectrum No. 55 – 1103 Ft. Benning Rd., Columbus, GA
30. Spectrum No. 59 – 1819 Roanoke Rd., LaGrange, GA
31. Spectrum No. 61 – 7330 Veterans Pkwy, Columbus, GA
32. Spectrum No. 62 – 1408 Veterans Pkwy, Columbus, GA
33. Spectrum No. 71 – 2580 Riverside Dr., Macon, GA
34. Spectrum No. 73 – 306 Harold G. Clarke Pkwy, Forsyth, GA
35. Spectrum No. 76 – 15 Spring St., Macon, GA 31201-1925
36. Spectrum No. 78 – 108 West Harris St., Pine Mountain, GA
37. Spectrum No. 80 – 1603 Auburn Road, Phenix City, AL
38. Spectrum No. 84 – 4425 2nd Ave., Columbus, GA
39. Spectrum No. 89 - 1801 – 12th Ave., Columbus, GA
40. Spectrum No. 94 – 5011 Romeiser Dr., Macon, GA
41. Spectrum No. 95 – 3903 Arkwright Rd., Macon, GA
42. Spectrum No. 96 – 6205 Zebulon Rd., Macon, GA
43. Spectrum No. 102 – 2157 Valleydale Rd., Hoover, AL
44. Spectrum No. 104 –1250 Columbiana Rd., Birmingham, AL

45. Spectrum No. 107 – 4734 U.S. Highway 280, Birmingham, AL
46. Spectrum No. 108 - 3421 Lorna Road, Hoover, AL
47. Spectrum No. 109 – 5375 Hwy 280 East, Birmingham, AL
48. Spectrum No. 110 – 7891 Vaughn Rd., Montgomery, AL
49. Spectrum No. 112 – 5771 Atlanta Hwy, Montgomery, AL
50. Spectrum No. 116 – 7790 Moffett Rd., Mobile, AL
51. Spectrum No. 118 – 4659 Airport Blvd., Mobile, AL
52. Spectrum No. 119 – 5601 Moffett Rd., Mobile, AL
53. Spectrum No. 122 – 7785 Cottage Hill Rd., Mobile, AL
54. Spectrum No. 131 – 2510/2514 Manchester Expressway, Columbus, GA
55. Spectrum No. 132 – 3365 Buena Vista Rd., Columbus, GA
56. Spectrum No. 133 – 3910 Macon Rd., Columbus, GA
57. Spectrum No. 134 – 1445 Veterans Pkwy, Columbus, GA
58. Spectrum No. 135 – 1715 South Lumpkin Rd., Columbus, GA
59. Spectrum No. 137 – 1503 Lafayette Pkwy, LaGrange, GA
60. Spectrum No. 138 – 311 Tripp St., Americus, GA
61. Spectrum No. 139 – 765 Hwy 82 West, Georgetown, GA
62. Spectrum No. 140 – 1625 Pepperell Pkwy, Opelika, AL
63. Spectrum No. 141 – 1116 North Eufaula Avenue, Eufaula, AL
64. Spectrum No. 13 - 171 E. Glenn Ave., Auburn, AL
65. Spectrum No. 17 - 3274 Victory Dr., Columbus, GA
66. Spectrum No. 25 - 3841 Miller Rd., Columbus, GA
67. Spectrum No. 37 - 413 West Main St., Manchester, GA
68. Spectrum No. 43 - 122 College Street, Hamilton, GA
69. Spectrum No. 44 - 5758 Milgen Rd., Columbus, GA
70. Spectrum No. 49 - 4410 Macon Rd., Columbus, GA
71. Spectrum No. 69 - 3802 Northside Dr., Macon, GA
72. Spectrum No. 74 - 4451 Forsyth Rd., Macon, GA
73. Spectrum No. 75 - 283 N. Lee St., Forsyth, GA
74. Spectrum No. 81 - 3724 South Railroad St. Phenix City, AL
75. Spectrum No. 85 - 4471 Ocurnulgee East, Macon, GA
76. Spectrum No. 90 - 2001 Wynnton Rd., Columbus, GA
77. Spectrum No. 91 - 5900 Veterans Pkwy, Columbus, GA
78. Spectrum No. 97 - 4775 Chambers Rd., Macon, GA
79. Spectrum No. 105 - 1955 Forestdale Blvd, Birmingham, AL
80. Spectrum No. 106 - 430 Fieldstown Rd., Gardendale, AL
81. Spectrum No. 121 - 3251 Dauphin St., Mobile, AL
82. Spectrum No. 124 - 2102 Wynton Rd., Columbus, GA
83. Spectrum No. 125 - 3701 Buena Vista Rd., Columbus, GA
84. Spectrum No. 126 - 5447 Forest Rd., Columbus, GA
85. Spectrum No. 127 - 5919 Miller Rd., Columbus, GA
86. Spectrum No. 128 - 9875 Airport Blvd, Mobile, AL
87. Spectrum No. 129 - 8775 Cottage Hill Rd., Mobile, AL
88. Spectrum No. 130 - 3500 Knollwood Dr., Mobile, AL
89. Spectrum No. 136 - 2525 Airport Thruway, Columbus, GA
90. Spectrum No. 142 - 1412 14th Street, Phenix City, AL

**SCHEDULE 2.4.1**

**Assumed Contracts**

## SPECTRUM REALTY LEASES (AS LESSEE)

1.  Spectrum No. 7 – Lease Agreement with Sue Blackmar Smith, Susan Smith Perry, Elizabeth Dana Smith Bolles and Ann Winston Smith Thornhill, dated January 12, 2000.

2.  Spectrum No. 13 – Lease Agreement with Mary M. Whaley, dated October 30, 2000.

3.  Spectrum No. 17 - Lease Agreement with Thomas B. Buck, Jr., dated August 28, 1984, as amended.

4.  Spectrum No.19 –   Spectrum No.19 – Lease Agreement with Wade H. Word, Eunice Word, Joe Word, Annie Word, Forrest Word, Margaret Word, Jubal Early Word and Stewart Word dated January 12, 1966. [Previous assignment from Racetrac Petroleum, Inc. also assigns previous leases to Spectrum:  Lease Agreement dated August 14, 1961, between Bessie Word, as Lessor, and Bruce Trammell and Hugo Waldheim, d/b/a Trammell Oil Co., as Lessee, recorded in Deed Volume 155, page 645, in the Office of the Probate Judge of Chambers County, Alabama; Lease Agreement between Bessie Word and Frances Word, as Lessor, and Bruce Trammell and Hugo Waldheim, d/b/a Trammell Oil Co., as Lessee, dated August 5, 1962, recorded in Deed Volume 159, page 250, in the Office of the aforesaid Probate Judge

5.  Spectrum No. 25 - Lease Agreement with Woodruff Rental Co., dated May 28, 1987.

6.  Spectrum No 37 – Sublease Agreement with JFM Inc. dated April 1, 1997.

7.  Spectrum No. 43 – Lease Agreement with James McMichael, dated August 1, 1999.

8.  Spectrum No. 44 – Lease Agreement with D.P. Milgen Properties dated November 1, 1989.

9.  Spectrum No. 46 – Lease Agreement with Billy Joe Battle dated April 20, 1989, as amended.

10. Spectrum No. 49 – Lease Agreement with Wachovia Bank, N.A. and Donna S. Hand, as Co-Trustees under Item Seven A. of the Last Will and Testament of C. Alex Sears, dated March 23, 2006.

11. Spectrum No. 55 – Lease Agreement with Reginald Endsley, dated April 16, 2002.

12. Spectrum No. 62 – Lease Agreement with Leah D. Hamer, dated June 26, 1998.

13. Spectrum No. 69 – Lease Agreement with J.W. Adams, III, dated August 5, 1997.

14.    Spectrum No. 74 – Lease Agreement with J. Heyward Adams, dated August 5, 1997.

15.    Spectrum No. 75 – Assignment and Assumption of Lease Agreement with Adams Oil Company, dated August 5, 1997, and underlying Lease Agreement dated June 24, 1997, originally between W.W. Anderson Estate Partnership, and J.W. Adams III, d/b/a Adams Oil Company (predecessor to Spectrum Realty).

16.    Spectrum No. 81 – Lease Agreement with Jerome L. O'Brien and Bowden Realty, Inc., dated September 21, 1998

17.    Spectrum No. 85 – Lease Agreement with Fountain Enterprises, LLC, dated July 13, 2000.

18.    Spectrum No. 90 – Lease Agreement with Brownie B. Elliott, dated January 1, 1995.

19.    Spectrum No. 91 – Lease Agreement with Barbara Ann Hale, dated December 29, 1996.

20.    Spectrum No. 97 – Lease Agreement originally between Gibson, Inc. and Ocmulgee Marketing, Inc., d/b/a Bennett Oil Company dated December 18, 1998.

21.    Spectrum No. 97 – Sublease Agreement originally between Subway Real Estate Corp., as Sublessor, and John Gibson, Jr., as Sublessee, dated October 28, 1994, assigned by John Gibson, Jr., as to his interest, to James Gordon Bennett, IV, by assignment dated February 1, 2001, as assigned by James Gordon Bennett, IV, to Albert Woodroof, as Nominee for Spectrum Stores, Inc., by assignment dated November 7, 2001.

22.    Spectrum No. 105 – Lease Agreement with Mary H. Crisler commencing July 10, 1988.

23.    Spectrum No. 106 – Lease Agreement with Harvey M. Fields and Jan M. Fields dated February 20, 1990, as amended.

24.    Spectrum No. 121 – Lease Agreement with George K. Graf, Marie L. Graf, and The Estate of Emil T. Graf, Jr. dated December 1, 1987.
                                          and
       Lease Agreement with Emil T. Graf, III for The Estate of Emil T. Graf, Jr., George K. Graf, Helen C. Graf, Marie L. Graf, Mary S. Graf, Marl M. Cummings, Jr., Eleanor Cummings, Blacksher White-Spunner and Peggy White-Spunner, dated May 30, 1966, as amended.

25.    Spectrum No. 124 – Lease Agreement with Right of First Refusal with Lynchar, Inc., dated October 25, 2002.

26.    Spectrum No. 125 - Lease Agreement with Right of First Refusal with Lynchar, Inc., dated October 25, 2002.

27.     Spectrum No. 126 - Lease Agreement with Right of First Refusal with Lynchar, Inc., dated October 25, 2002.

28.     Spectrum No. 127 - Lease Agreement with Right of First Refusal with Lynchar, Inc., dated October 25, 2002.

29.     Spectrum No. 128 – Lease Agreement with LL&T Property Ltd., dated June 17, 1988.

30.     Spectrum No. 129 – Lease Agreement with O'Mar, Inc. dated February 2, 1989.

31.     Spectrum No. 130 – Lease Agreement with O'Mar, Inc. dated April 19, 1989.

32.     Spectrum No. 136 – A ssignment and Assumption of Lease Agreement with Crown Stations, Inc. dated October 20, 2003, and underlying Lease Agreement with Simons Plaza Associates, LP, successor to Simons Plaza Associates, Ltd., dated September 6, 1978.

33.     Spectrum No. 142 - Assignment and Assumption of Lease Agreement with Fast Fare, Inc. dated October 20, 2003, and underlying Lease Agreement with Joe B. Rossier, Jr., d/b/a Rossier Investments, as successor to J.H. Shepherd and Josephine Shepherd, dated February 8, 1971, as amended.

## SPECTRUM REALTY LEASES (AS LESSOR)

34.     Spectrum No. 5 – LaGrange, GA – Lease Agreement between Spectrum Realty, Inc. and Laundry Concepts, Inc., dated February 19, 2002. (Laundry Mat)

35.     Spectrum No. 16 – Ground Lease with Outdoor Systems, Inc. dated July 20, 1998. (Billboard)

36.     Spectrum No. 25 – Ground Lease with Outdoor Systems, Inc. dated July 20, 1998. (Billboard)

37.     Spectrum No. 26 – Ground Lease with Outdoor Systems, Inc. dated July 20, 1998. (Billboard)

38.     Spectrum No. 44 - Ground Lease with Outdoor Systems, Inc. dated April 1, 1998. (Billboard)

39.     Spectrum No. 45 – Lease Agreement with Viacom Outdoor, Inc. dated April 29, 2005. (Billboard)

40.     Spectrum No. 46 – Ground Lease with Outdoor Systems, Inc. dated February 22, 2000. (Billboard)

iii

41.  Spectrum No. 51 – Lease Agreement between Spectrum Realty, Inc. and Kashif Lodhi d/b/a Tasneeri Enterprise, LLC, dated December 29, 2004. (Laundry Mat/Dry Cleaning pickup. No on-site dry cleaning)

42.  Spectrum No. 52 – Ground Lease with Outdoor Systems, Inc dated April 1, 1998. (Billboard)

43.  Spectrum No. 52 – Ground Lease with Viacom Outdoor, Inc. dated December 9, 2002. (Billboard)

44.  Spectrum No. 53 – Lease Agreement between Spectrum Realty, Inc. and G E W, Inc. d/b/a/ Wade Cleaners and d/b/a/ Wade Linen dated September 5, 2002. (Dry cleaning pickup and drop off. No on-site cleaning)

45.  Spectrum No. 61 – Ground Lease with Outdoor Systems, Inc. dated September 30, 1998. (Billboard)

46.  Spectrum No. 61 – Lease Agreement between Spectrum Realty, Inc. (f/k/a Spectrum Stores, Inc.) and Tacala, Inc. dated March 24, 1998. (Taco Bell/Pizza Hut Express)

47.  Spectrum No. 61 – Lease Agreement between Spectrum Realty, Inc. and G E W, Inc., d/b/a/ Wade Cleaners and d/b/a Wade Linen dated October 11, 2005. (Dry cleaning pick up and drop off. No on-site cleaning)

48.  Spectrum No. 62 - Lease Agreement between Spectrum Realty, Inc. (f/k/a Spectrum Stores, Inc.) and Tacala, Inc. dated March 24, 1998. (Taco Bell/Pizza Hut Express)

49.  Spectrum No. 62 - Lease Agreement between Spectrum Realty, Inc. and Subway Real Estate Corp. dated September 17, 2004. (This lease erroneously titled and referred to as a Sublease, but actually is a lease between fee owner and tenant).

50.  Spectrum No. 73 – Lease with Action Outdoor Advertising, Inc. dated November 20, 1998. (Billboard)

51.  Spectrum No. 73 – Sublease Agreement originally between Spectrum Stores, Inc., and Forsyth Waffle King, LLC, dated August 20, 1998, as amended. Tenant is now CDM Associates, LLC.

52.  Spectrum No. 74 – Sublease/Parking Agreement with Michael Taylor dated 2004 (Verbal) which permits the use of 2 parking spaces and is terminable on 60 days notice.

53.  Spectrum No. 85 – SubLease Agreement between Spectrum Realty, Inc., and SABA Services, Inc. dated May 4, 2001. (Dairy Queen)

54.  Spectrum No. 90 – Ground Lease Agreement with BoardWorks Outdoor Advertising Company, Inc. dated October 23, 2000. (Billboard)

iv

55.  Spectrum No. 96 – Lease Agreement originally between Mid State Investments, Inc and Tacala, Inc. dated June 25, 1997. Spectrum Realty, Inc. is current landlord having purchased property from Mid State.

56.  Spectrum No. 110 - Billboard Sign Lease Agreement with The Lamar Companies, dated November 14, 2005.

57.  Spectrum No. 112 – Lease Agreement between Spectrum Realty, Inc. and Michael W. King and James M. King, dated November 20, 2005. (Martial Arts School)

## FRANCHISE AGREEMENTS

58.  Spectrum No. 22 –AFC Enterprises, Inc. Church's Chicken Franchise Agreement For Convenience Stores and Travel Plazas between Spectrum Stores, Inc. and AFC Enterprises, Inc. dated August 2, 2002.

59.  Spectrum No. 22 – Stuckey's Express Unit Franchise Agreement between Spectrum Stores, Inc. and Stuckey's Corporation, dated July 21, 2000.

60.  Spectrum No. 59 - AFC Enterprises, Inc. Church's Chicken Franchise Agreement For Convenience Stores and Travel Plazas between Spectrum Stores, Inc. and AFC Enterprises, Inc. dated January 12, 2004.

61.  Spectrum No. 71 – Stuckey's Express Unit Franchise Agreement between Spectrum Stores, Inc. and Stuckey's Corporation dated December 3, 1998.

62.  Spectrum No. 73 – Stuckey's Express Unit Franchise Agreement between Spectrum Stores, Inc. and Stuckey's Corporation dated August 14, 1998.

63.  Spectrum No. 97 – Subway Franchise Agreement between Doctor's Associates, Inc. and Albert C. Woodroof, as Nominee for Spectrum Stores, Inc., dated November 7, 2001.

## ATM AGREEMENTS

64.  Spectrum No. 96 – Automated Teller Machine Agreement between Spectrum Stores, Inc., Spectrum Realty, Inc. and Capital City Bank, dated November 1, 2005.

65.  Spectrum Nos. 7, 8, 15, 16, 17, 22, 26, 39, 44, 45, 46, 48, 51, 52, 53, 59, 61, 62, 80, 90, 91, 125 and 137 - Automated Teller Machine Agreement between Spectrum Stores, Inc., Spectrum Realty, Inc. and SunTrust Bank, dated September 1, 2003.

66.  Spectrum No. 47 - Verbal Agreement between Spectrum Stores, Inc. and Auburn Bank.

67.  Spectrum No. 49 – Assignment and Assumption of Lease Agreement dated June 16, 1993 between Sing Oil Co. and Spectrum Stores, Inc. and underlying Lease Agreement dated

June 20, 1980, originally between Sing Oil Company (predecessor to Spectrum Stores, Inc.) and First National Bank of Georgia (predecessor to Wachovia, N.A.), as amended

68.  Spectrum No. 52 - Agreement dated April 22, 1996, between Spectrum Stores and SunTrust Bank (expires April 30, 2006)

69.  FTI-NetBank Service Agreement dated July 28, 2000, for ATM's at Stores 2-5, 11-14, 19-21, 24, 25, 37, 38, 40, 42, 43, 65, 68, 69, 71, 73-76, 78, 81, 84, 85, 89, 94, 95, 97, 102, 104, 106-110, 112, 118, 119, 121, 124, 126-130, 134-136, 138, 139, 141 and 142.

## CREDIT CARD CONTRACTS

70.  EFS National Bank Authorization, Settlement and Payment and Merchant Agreement dated February 28, 2002

71.  ComData Network, Inc. Independent and Fleet Management Agreement dated March 8, 1999

72.  Fleet One LLC Fleet One Card Processing and Merchant Agreement dated March 9, 2005

73.  FleetCor (Fuel Man) Merchant Agreement dated May 2, 2005

74.  Auburn University Tiger Club Merchant Agreement dated February 1, 2002

## TELEPHONE & BROADBAND CONTRACTS

75.  Bell South Frame Contract /BellSouth Business Services Master Agreement with BellSouth Company dated December 30, 2003, including (a) Bell South Frame Contract - Letter of Election - September 8, 2004—Addendum to BellSouth Business Services Master Agreement, No. DSO 121 dated March 26, 2004 and (b) BellSouth Addendum to Business Services Master Agreement dated September 8, 2004.

76.  Spectrum No. 2 - Charter Service Agreement, dated December 10, 2004

77.  Spectrum No. 19 - Charter Installation and Distribution Agreement dated February15, 2005

78.  Spectrum Nos. 38 & 59 - Charter Service Agreements, dated December 10, 2004

79.  Spectrum No. 94 - Cox Commercial Services Agreement With Authorization Letters dated July 20, 2005, expires July 20, 2006.

80.  Spectrum No. 97 - Cox Business Services Commercial Services Agreement dated December 2, 2004

81.  FusionPoint Product / Service Proposal - 90 Site Network - December 31, 2003, with various renewal dates.

82.  Spectrum No. 3 - Knology Single Computer-No Network Connection Agreement (Verbal)

83.  Spectrum No. 11 - Knology Single Computer-No Network Connection Agreement (Verbal)

84.  Spectrum No. 12 - Knology Single Computer-No Network Connection Agreement (Verbal)

85.  Spectrum No. 16 - Knology Single Computer-No Network Connection Agreement (Verbal)

86.  Spectrum No. 24 - Knology Single Computer-No Network Connection Agreement (Verbal)

87.  Spectrum No. 40 - Knology Single Computer-No Network Connection Agreement (Verbal)

88.  Spectrum No. 45 - Knology Single Computer-No Network Connection Agreement dated January 24, 2005

89.  Spectrum No. 46 -Knology Single Computer-No Network Connection Agreement dated February 2, 2005

90.  Spectrum No. 21 -Roanoke Telephone Company Modem Maintenance Agreement dated December 3, 2004

## FUEL AGREEMENTS

91.  Wholesale Marketer Agreement dated January 1, 2004, between Motiva Enterprises, LLC, and Chattahoochee Oil Company, Inc.

92.  Spectrum No. 89 -RVI Step-Out Incentive Agreement, dated September 16, 2002 between Motiva Enterprises, LLC and Spectrum Stores, Inc.

93.  Spectrum No. 90 -Wholesale Marketer Facility Development Incentive Program Agreement, dated October 17, 2001 between Motiva Enterprises, LLC and Spectrum Stores, Inc.

94.  Spectrum No. 91 -RVI Step-Out Incentive Agreement, dated September 16, 2002 between Motiva Enterprises, LLC and Spectrum Stores, Inc.

Schedule 2.4.1

4/2/06 draft

95.  Spectrum No. 94: RVI Step-Out Incentive Agreement, dated December 17, 2004 between Motiva Enterprises, LLC and Chattahoochee Oil Company (unexecuted by Motiva)

96.  Spectrum No. 84 -RVI Step-Out Incentive Agreement, dated September 13, 2002 between Motiva Enterprises, LLC and Spectrum Stores, Inc.

97.  Spectrum No. 90 -RVI Step-Out Incentive Agreement, dated September 16, 2002 between Motiva Enterprises, LLC and Spectrum Stores, Inc.

98.  Spectrum No. 95 -RVI Step-Out Incentive Agreement, dated December 17, 2004 between Motiva Enterprises, LLC and Chattahoochee Oil Company (unexecuted by Motiva)

99.  Spectrum No. 96 -RVI Step-Out Incentive Agreement, dated October 18, 2005 between Motiva Enterprises, LLC and Chattahoochee Oil Company

100.  Spectrum No. 89 -Wholesale Marketer Facility Development Incentive Program Agreement, dated October 17, 2001 between Motiva Enterprises, LLC and Spectrum Stores, Inc.

101.  Spectrum No. 91 -Wholesale Marketer Facility Development Incentive Program Agreement, dated October 17, 2001 between Motiva Enterprises, LLC and Spectrum Stores, Inc.

102.  Branded Jobber Contract (Retail), dated May 1, 2004, between BP Products North America, Inc. and Chattahoochee Oil Company, Inc., with Rider dated April 22, 2004, and Supplemental Agreement dated December 29, 2000, between BP Exploration & Oil, Inc. and Spectrum Stores, Inc., executed in connection with that certain Agreement of Purchase and Sale dated December 29, 2000, between said parties.

103.  Spectrum No. 8: Jobber Outlet Incentive Program Contract, dated December 17, 2004 between BP Products North America Inc. and Chattahoochee Oil Co., Inc.

104.  Spectrum No. 24: Jobber Outlet Incentive Program Contract, dated December 17, 2004 between BP Products North America Inc. and Chattahoochee Oil Co., Inc.

105.  Spectrum No. 44: Jobber Outlet Incentive Program Contract, dated December 17, 2004 between BP Products North America Inc. and Chattahoochee Oil Co., Inc.

106.  Spectrum No. 49: Jobber Outlet Incentive Program Contract, dated December 17, 2004 between BP Products North America Inc. and Chattahoochee Oil Co., Inc.

107.  Spectrum No. 50: Jobber Outlet Incentive Program Contract, dated December 17, 2004 between BP Products North America Inc. and Chattahoochee Oil Co., Inc.

108.  Spectrum No. 52: Jobber Outlet Incentive Program Contract, dated December 17, 2004 between BP Products North America Inc. and Chattahoochee Oil Co., Inc.

Schedule 2.4.1

109. Spectrum No. 53: Jobber Outlet Incentive Program Contract, dated December 17, 2004 between BP Products North America Inc. and Chattahoochee Oil Co., Inc.

110. Spectrum No. 69: Jobber Outlet Incentive Program Contract, dated December 17, 2004 between BP Products North America Inc. and Chattahoochee Oil Co., Inc.

111. Spectrum No. 71: Jobber Outlet Incentive Program Contract, dated December 17, 2004 between BP Products North America Inc. and Chattahoochee Oil Co., Inc.

112. Spectrum No. 73: Jobber Outlet Incentive Program Contract, dated December 17, 2004 between BP Products North America Inc. and Chattahoochee Oil Co., Inc.

113. Spectrum No. 74: Jobber Outlet Incentive Program Contract, dated December 17, 2004 between BP Products North America Inc. and Chattahoochee Oil Co., Inc.

114. Spectrum No. 75: Jobber Outlet Incentive Program Contract, dated December 17, 2004 between BP Products North America Inc. and Chattahoochee Oil Co., Inc.

115. Spectrum No. 84 -RVI Step-Out Incentive Agreement, dated September 16, 2002 between Motiva Enterprises, LLC and Spectrum Stores, Inc.

116. Spectrum No. 84 -Wholesale Marketer Facility Development Incentive Program Agreement, dated October 17, 2001 between Motiva Enterprises, LLC and Spectrum Stores, Inc.

117. Spectrum No. 85 Jobber Outlet Incentive Program Contract, dated March 23, 2001 between Amoco Oil Company and Spectrum Stores, Inc.

118. Spectrum Nos. 102, 104 - 109 Jobber Re-Image Program Contract, dated August 15, 2001 between BP Exploration and Oil Company or Amoco Oil Company and Spectrum Stores, Inc (unexecuted by BP Amoco)

119. Spectrum Nos. 110, 112 Jobber Re-Image Program Contract, undated, with scheduled dated June 5, 2003, between BP Exploration and Oil Company or Amoco Oil Company and Spectrum Stores, Inc (unexecuted by BP Amoco)

120. Spectrum No. 112: Jobber Outlet Incentive Program Contract, dated March 5, 2004 between BP Products North America Inc. and Chattahoochee Oil Co., Inc.

121. Spectrum No. 116: Jobber Outlet Incentive Program Contract, dated September 3, 2002 between BP Products North America Inc. and Spectrum Stores, Inc.

122. Spectrum Nos. 118 Jobber Re-Image Program Contract, between BP Exploration and Oil Company and Spectrum Stores, Inc., undated and unexecuted, however incentive payments commenced December 1, 2003

123.   Spectrum No. 119 Jobber Re-Image Program Contract, between BP Exploration and Oil Company and Spectrum Stores, Inc., undated and unexecuted, however incentive payments commenced June 1, 2004

124.   Spectrum No. 121 Jobber Re-Image Program Contract, between BP Exploration and Oil Company and Spectrum Stores, Inc., undated and unexecuted, however incentive payments commenced December 1, 2003

125.   Spectrum No. 122 Jobber Re-Image Program Contract, between BP Exploration and Oil Company and Spectrum Stores, Inc., undated and unexecuted, however incentive payments commenced October 1, 2003

126.   Spectrum No. 85 Jobber Outlet Incentive Program Contract, dated March 23, 2001 between Amoco Oil Company and Spectrum Stores, Inc.

127.   Spectrum Nos. 102, 104 - 109 Jobber Re-Image Program Contract, dated August 15, 2001 between BP Exploration and Oil Company or Amoco Oil Company and Spectrum Stores, Inc (unexecuted by BP Amoco)

128.   Spectrum Nos. 110, 112 Jobber Re-Image Program Contract, dated August 15, 2001 between BP Exploration and Oil Company or Amoco Oil Company and Spectrum Stores, Inc (unexecuted by BP Amoco

129.   Spectrum No. 128 Jobber Outlet Incentive Program Contract, dated February 27, 2003 between BP Products North America Inc. and Spectrum Stores, Inc. with associated Addendum A

130.   Spectrum No. 129 Jobber Outlet Incentive Program Contract, dated February 27, 2003 between BP Products North America Inc. and Spectrum Stores, Inc. with associated Addendum A

131.   Spectrum No. 130 Jobber Outlet Incentive Program Contract, dated February 27, 2003 between BP Products North America Inc. and Spectrum Stores, Inc. with associated Addendum A

132.   Fuel Transportation Agreement dated April 12, 2004, between Spectrum Stores, Inc. and Florida Rock & Tank Lines, Inc., amended by letter agreement dated March 9, 2006.

133.   Reseller Product Sales Terms Agreement letter dated October 1, 1996, between Marathon Oil Company and Spectrum Stores, Inc.

134.   Placid Gasoline Supply Proposal dated January 14, 2004, between Placid and Spectrum Stores, Inc.

135.   Spectrum Nos. 124, 125, 126 and 127 – Product Supply Agreement dated October 25, 2002, between Lynchar, Inc. d/b/a T&W Oil Company and Spectrum Stores, Inc. and Spectrum Realty, Inc.

136.   Spectrum No. 37 - Gasoline Sublease and Operating Agreement dated April 1, 1997, between JFM Incorporated, Inc., Spectrum Stores, Inc. and Willis Oil Company.

137.   Dispenser Loan to Own Agreement for End User Account between Spectrum Stores, Inc. and Corporate Express (a distributor for Kimberly-Clark Corp.) dated February 10, 2005.

## MERCHANDISING/DISTRIBUTION AGREEMENTS

138.   Anderson News Company Retail Display Agreement dated September 24, 2004.

139.   Blackhawk Marketing (PRE Solutions) - Gift Card Agreement Acknowledgment – April 2004—Blackhawk Marketing Gift Card Agreement Acknowledgment with PRE Solutions, Inc. and Blackhawk Marketing Services, Inc. dated November 11, 2004.

140.   Coca Cola Agreement dated July 1, 2004

141.   Commercial Pay Phones, LLC Lease dated May 27, 2004

142.   Eastman Kodak Rebate Agreement dated January 1, 2005.

143.   2006 C-Store Retailer Program with Advantage CMN with respect to numerous products.

144.   2006 Retailer Rebate Performance Agreements (Various)

145.   Georgia Lottery Retailer Contract dated February 26, 1999, between Georgia Lottery Corporation and Spectrum Stores, Inc.

146.   Hastings Entertainment Lease dated June 27, 2000

147.   2006 Hershey's Top Performer Program Retailer Contract dated November 16, 2005.

148.   2006 Kraft Foodservice Convenience Store Sales - Retailer Performance Accrual Program and Annual Contract dated October 26, 2005.

149.   Branded Convenience Store Agreement with Krispy Kreme Doughnuts Corporation dated March 1, 1999

150.   Lorillard Merchandising Agreement dated January 1, 2006, between with Lorillard Tobacco Company and Spectrum Stores, Inc.

151.   MarketFare Foods, Inc. Agreement for Sale of Products dated December 31, 2005

4/2/06 draft

152.  MasterFoods 2006 Partners Program Participation Agreement with Masterfoods USA, a division of Mars, Incorporated, dated January 12, 2006.

153.  McLane Company, Inc. Distribution Service Agreement dated May 27, 2004

154.  nexAir, LLC Product Supply and Service Agreement dated August 22, 2001

155.  Pepsi Cola Fountain Company, Inc. Fountain Beverage Sales Agreement dated July 1, 2004

156.  Pepsi Bottler C& G Marketing Agreement dated June 16, 2004

157.  Philip Morris USA Retail Leaders 2006 Agreement dated February 13, 2006.

158.  Pre-Solutions Agreement (Verbal)

159.  Quaker Tropicana Gatorade Sales 2006 Customer Development Agreement dated November 30, 2005

160.  Packaged Ice, Inc d/b/a Reddy Ice Supply Agreement Letter dated January 30, 2002

161.  RJ Reynolds Retail Partners Marketing Plan Contract dated April 2, 2005

162.  S&D Coffee, Inc. Partnership Agreement dated September 10, 2001

163.  FritoLay – Spectrum 2006 Annual Plan (agreement yet to be signed)

## FACILITY CONTRACTS

164.  Spectrum Nos. 102, 104, 105, 106, 107, 108 and 109 -ONYX Waste Services Southeast Service Agreement dated January 3, 2005

165.  Spectrum No. 112 -Montgomery Water Contract

166.  Spectrum No. 124 -Knox Termite Control Agreement dated February 4, 2003

167.  Spectrum No. 59 - GEAC Hardware Support Agreement dated March 29, 2005 (Church's POS service repairs)

168.  Spectrum No. 59 - GEAC Software Support Agreement dated March 29, 2005 (Church's POS service repairs)

169.  Environmental Waste Solutions Solid Waste/Recycling Cost Reduction Service Agreement dated June 4, 2004

170.  H&T Car Wash Systems Service Agreement effective April 1, 2003

Schedule 2.4.1

171.    Knox Pest Control Contract dated May 3, 2001

172.    Sparkling Clean Service Agreement dated August 3, 2005.

173.    Titan Management Group UST Compliance Management Services Agreement dated October 31, 2001

## SERVICE CONTRACTS

174.    Air Serve/Air Express Contract dated June 28, 2004 (Air/Water/Vacuum machines)

175.    CBE (Registers & Security Service) Maintenance Contract dated February 1, 2006

176.    Knowledge Support Systems, Inc. Software License and Service Agreement dated February 22, 2006

177.    NexCheck Agreement dated December 1, 2005

178.    PDI Master License Renewal dated February 6, 1992

179.    PDI Master Software License Addendum - PDI/Petroleum Distribution dated February 24, 2004

180.    PDI Master Software License Addendum - PDI / Rebate Manager dated August 28, 2001

181.    Southeastern Utility Services, Inc. Utility Cost Analysis Agreement dated April 3, 1990

182.    Travelers Express Master Trust Agreement dated March 5, 2003

183.    Letter Agreement with TLM Industries for customized uniform program dated May 30, 1997.

184.    Spectrum Nos. 22 & 59 - NUCO, Inc. Bulk CO2 Services Agreement For SMS Members (Church's Chicken and Popeye's Chicken & Biscuit System Operators.

## HIGHWAY ADVERTISING SIGN CONTRACTS

185.    Spectrum No. 8 - Highway Sign Contract dated July 25, 2005

186.    Spectrum No. 19 - Highway Sign Contract dated January 5, 2006

187.    Spectrum No. 22 - Highway Sign Contract dated January 5, 2006

188.    Spectrum No. 24 - Highway Sign Contract dated January 5, 2006

189. Spectrum No. 26 - Highway Sign Contract dated November 1, 2005

190. Spectrum No. 39 - Highway Sign Contract dated January 5, 2006

191. Spectrum No. 40 - Highway Sign Contract dated January 1, 2005

192. Spectrum No. 46 - Highway Sign Contract dated July 25, 2005

193. Spectrum No. 53 - Highway Sign Contract dated July 25, 2005

194. Spectrum No. 69 - Highway Sign Contract dated July 25, 2005

195. Spectrum No. 71 - Highway Sign Contract dated July 25, 2005

196. Spectrum No. 73 - Highway Sign Contract dated July 25, 2005

197. Spectrum No. 75 - Highway Sign Contract dated July 1, 2005

198. Spectrum No. 76 - Highway Sign Contract dated July 10, 2005

199. Spectrum No. 84 - Highway Sign Contract dated July 25, 2005

200. Spectrum No. 85 - Highway Sign Contract dated July 25, 2005

201. Spectrum No. 94 - Highway Sign Contract dated July 1, 2005

202. Spectrum No. 95 - Highway Sign Contract dated July 25, 2005

203. Spectrum No. 96 -Highway Sign Contract dated July 25, 2005

204. Spectrum No. 97 - Highway Sign Contract dated July 1, 2005 (Spectrum)

205. Spectrum No. 97 - Highway Sign Contract dated July 1, 2005 (Subway)

206. Spectrum No. 106 - Highway Sign Contract dated January 1, 2005

207. Spectrum No. 125 - Highway Sign Contract dated July 25, 2005

208. Spectrum No. 131 - Highway Sign Contract dated July 20, 2005

209. Spectrum No. 136 - Highway Sign Contract dated July 20, 2005

210. Spectrum No. 137 - Highway Sign Contract dated July 20, 2005

**SECURITY CONTRACTS**

211.   AT Systems Southeast Armored Car Service Agreement dated January 1, 2005

## ASSET PURCHASE AGREEMENTS

The following five asset purchase agreements are being assigned by Sellers and assumed by Purchaser solely with respect to the environmental indemnity obligations provided by the sellers therein to Sellers, which are being assigned to Purchaser, and the environmental indemnity obligations therein that Sellers provided to such sellers, which obligations are being assumed by Purchaser.

212.   Asset Purchase Agreement between Mid-State Investments, Inc., Ocmulgee Marketing, Inc., a/k/a Bennett Oil Company, J. Gordon Bennett, III, J. Gordon Bennett, IV and Glenn Bennett and Spectrum Stores, Inc. and Spectrum Realty, Inc., dated August 21, 2000, as amended.

213.   Agreement of Purchase and Sale between BP Exploration & Oil, Inc. and Spectrum Holding, Inc., Spectrum Stores, Inc. and Spectrum Realty, Inc., dated December 29, 2000.

214.   Agreement of Purchase and Sale between United Oil Corporation, Samuel W.C. Hamlett and Courtlen P. Hamlett, III and Spectrum Stores, Inc. and Spectrum Realty, Inc., dated July 13, 2000.

215.   Contract of Sale between Crown Stations, Inc. and Fast Fare, Inc. and Spectrum Stores, Inc. and Spectrum Realty, Inc., dated July 29, 2003, as amended.

216.   Asset Purchase Agreement between Adams Oil Company, J. W. ADAMS, III, and J. Heyward Adams and Spectrum Stores, Inc., dated June 2, 1997.

## TENANT ESTOPPEL CERTIFICATE

To:    Circle K Stores Inc.
       2440 Whitehall Park Drive, Suite 800
       Charlotte, NC 28273
       Attn.: Real Estate Department

Re:    Location: **5771 Atlanta Hwy, Montgomery, AL (the "Premises")**

This estoppel relates to that certain Lease Agreement between Spectrum Realty, Inc., as "Lessor" ("Landlord"), and Michael W. King and James M. King, as "Lessee" ("Tenant"), dated November 20, 2005. Such lease is hereinafter referred to as the "Lease." Spectrum Realty, Inc. is assigning its interest in the Premises to Circle K Stores Inc., who will become the Lessor under the Lease. Tenant advises you as of the date hereof and to its knowledge and belief, as follows:

1.  A true, correct and complete copy of the Lease, with all amendments thereto, is attached hereto.  The Lease contains all of the agreements between Tenant and Landlord, and is in full force and effect.

2.  Tenant is in actual possession of the Premises and all work required to be completed pursuant to the Lease has been satisfactorily completed.

3.  The current term of the Lease commenced on November 20, 2005, and will expire on November 30, 2010, unless sooner terminated or later extended in accordance with its terms. Tenant has no right to renew or extend the Lease term or to terminate the Lease except as follows:  One 5-year renewal options.

4.     Tenant commenced the payment of rent on January 20, 2006, and has paid rent and all other charges due under the Lease through May 31, 2006.  The current monthly rent payable by Tenant under the Lease is $3000.  No other rent has been paid in advance.

5.  Tenant has delivered a security deposit to Landlord in the amount of NONE.

6.  As of the date of this Certificate:  (a) neither Tenant nor Landlord is in default under the Lease; (b) Landlord has performed all of its obligations under the Lease; (c) no event has occurred which, with the passage of time or the giving of notice or both, would constitute an event of default by Landlord under the Lease; and (d) Tenant has no current defenses or claims against Landlord or rights of offset against any rents payable to Landlord under the Lease.

7.     Tenant has received no notice by any governmental authority or person claiming a violation of, or requiring compliance with, any applicable federal, state or local law or regulation intended to protect the environment and public health and safety.

DEFENDANT'S
EXHIBIT

3

The undersigned has all requisite authority to execute this Estoppel Certificate on behalf of Tenant.

Date Executed: May _____, 2006

TENANT:

_____(L.S.)
Michael W. King

_____(L.S.)
James M. King